UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMMANUEL DONTEZE WILLIAMS,<br><br>          Plaintiff,<br><br>     v.<br><br>Z. AUSTEN,<br><br>          Defendant. | Case No. 4:19-cv-06882 YGR (PR)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

**I.     INTRODUCTION**

Plaintiff Emmanuel Donteze Williams, a state prisoner currently incarcerated at Pelican Bay State Prison ("PBSP"), has filed this *pro se* civil rights complaint under 42 U.S.C. § 1983. Plaintiff claims that Defendant Z. Austen (hereinafter "Defendant"), a correctional officer at PBSP and the sole Defendant in this action, used excessive force in violation of Plaintiff's Eighth Amendment right against cruel and unusual punishment. Dkt. 1. Specifically, Plaintiff alleges that on June 7, 2018, Defendant used excessive force by unreasonably firing his 40 mm. launcher, which resulted in Plaintiff being injured and losing a tooth. *Id.* at 3.[1] Plaintiff seeks monetary and punitive damages. *Id.*

In an Order dated May 1, 2020, the Court found Plaintiff's complaint stated a cognizable Eighth Amendment claim for the use of excessive force against Defendant. Dkt. 9 at 2.

The parties are presently before the Court on Defendant's motion for summary judgment. Dkt. 20. Plaintiff has filed an opposition to Defendant's motion. Dkt. 25. Defendant has filed a reply to the opposition. Dkt. 26.

Having read and considered the papers submitted and being fully informed, the Court hereby GRANTS Defendant's motion for summary judgment.

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

## II.    FACTUAL BACKGROUND

### A.    The Parties

At all times relevant to this action, Plaintiff was a state inmate incarcerated at PBSP in Crescent City, California, and Defendant was a correctional officer at PBSP.  Austen Decl. ¶¶ 1, 3; *see* Shryock Decl., Ex. 4 (Pl.'s Depo.) at 21:10-15, 32:19-33:24.

### B.    Plaintiff's Version

The following background relating to Plaintiff's Eighth Amendment claim is taken from the Court's May 1, 2020 Order:

> Plaintiff alleges that on June 7, 2018, he was subjected to excessive force by Defendant. Dkt. 1 at 3. Specifically, Plaintiff alleges that on the date of the incident Defendant "used excessive force that was unnecessary for there was no immine[n]t threat observed by [Defendant]." *Id.* Plaintiff adds that "given the circumstances there was no clear reason as to why [Defendant] fired his 40 mm[.] launcher." *Id.* Furthermore, Plaintiff claims that Defendant "never stated in [his] incident report [that] he observed behavior that may have le[]d to [serious bodily injury], or [great bodily injury] to another." *Id.* Finally, Plaintiff claims that he lost a tooth during this altercation. *Id.*

Dkt. 9 at 2.[2]

### C.    Defendant's Version

Defendant has filed declarations and documentary evidence showing the following factual background.  In June 2018, Defendant regularly worked second-watch, from 6:00 a.m. until 2:00 p.m., as a floor officer in Building 6 on Facility B.  Austen Decl. ¶ 6; Pl.'s Depo. at 47:22-25. Plaintiff was housed in Building 5 on Facility B at that time.  *Id.*

Part of Defendant's job as a floor officer entailed monitoring the yard when inmates from his building were out on the yard in order to help ensure the safety and security of both inmates and staff members who were on the yard.  Austen Decl. ¶¶ 8-9.  While inmates from Building 6

---

[2] As further indicated below in Defendant's version, Defendant contradicts Plaintiff's statement that Defendant failed to state in his incident report that he observed behavior that may have led to serious bodily injury or great bodily injury. Dkt. 26 at 3, fn. 2. In his reply, Defendant points to the incident report he authored attached to Plaintiff's opposition, which states as follows: "The two unidentified inmates were punching the other unidentified inmate in the head and upper torso. In an attempt to prevent serious bodily injury, I utilized my state issued Defense Technology, 40 mm[.] launcher . . . and fired one exact impact 40 mm[.] round at the lower extremities of one of the combative inmates." *Id.* (citing Dkt. 25 at 25-26).

2

were released to yard and were out on the yard, Defendant was stationed at the observation window in Building 6, which is directly above the entrance to the building, looking out on to the yard. *Id.* If a fight or other disturbance occurred on the yard, Defendant could activate his alarm, give instructions over the public address system, or use force if necessary. *Id.* ¶ 9. Defendant had access to a mini-14 rifle that shoots live rounds and a 40 mm. launcher that shoots exact impact rounds.[3] *Id.* Exact impact rounds are more specifically known as "eXact iMpact 40MM Sponge Rounds (Projectile)" (hereinafter "40 mm. rounds") and are designated as a less lethal rounds. Defoe Decl. ¶¶ 9, 23(e).

When using the 40 mm. launcher, Defendant was trained to aim anywhere below the waist, excluding the groin area, because a shot directed above the waist or in the groin area may result in serious injury or death. Austen Decl. ¶ 10. He was also instructed that the 40 mm. launcher should not be used from less than 10 feet away from an intended target, because that could cause the target serious bodily injury or even death. *Id.* The 40 mm. launcher should also not generally be used from more than 105 feet away from the intended target, because at that distance the exact-impact round may not be effective. *Id.*

In June 2018, there were on-going disputes between members or factions of the Crips prison gang, resulting in frequent riots when inmates were on the yard. Austen Decl. ¶ 11; *see also* Pl.'s Depo. at 98:13-99:19. Inmates, especially gang-members and associates, may carry inmate-manufactured weapons and use them during fights or riots. Pl.'s Depo. at 73:3-17, 74:13-75:8; Austen Decl. ¶ 4. In fights or riots involving inmate-manufactured weapons, inmates can be seriously injured, or even killed. *Id.* Inmates can also be seriously injured in fights or riots, even those that do not involve inmate-manufactured weapons, and frequently need to be transported to the prison's infirmary or to an outside hospital to have their injuries treated. Austen Decl. ¶ 5.

On the morning of June 7, 2018, Defendant was stationed at the observation window in Building 6 while inmates from Buildings 5 and 6 on Facility B were out to yard. Pl.'s Depo. at

---

[3] Defendant also had access to various chemical agents, but those typically cannot be used from the observation window, unless an incident is occurring immediately below the window. Austen Decl. ¶ 9.

3

48:24-49:4, 68:21-69:7; Austen Decl. ¶ 12. As the inmates were being recalled from yard and returning to their housing units, an inmate riot broke out. Austen Decl. ¶ 13, Exs. 1, 2[4]; Pl.'s Depo. at 111:11-114:24, 136:3-137:16, 149:20-150:9. Plaintiff was walking near a group of people, when one of them said something to a group of inmates some distance away. *Id.* The other group of inmates that was some distance away then advanced on the group of inmates near Plaintiff. *Id.* It is not clear which group threw the first punch, but the two groups of inmates began punching each other in the heads and torso areas. *Id.* During this initial melee, one of the combative inmates reached for something, and then swung at Plaintiff, but he dodged the blow. Pl.'s Depo. at 118:14-20, 137:1-139:1, 149:20-151:11. After the riot was over, Plaintiff realized that he had been stabbed in the arm with an inmate-manufactured weapon, and he believes he was stabbed during this initial part of the riot. *Id.*

From Defendant's position, over 100 feet away, he could not tell whether any of the inmates had or were using inmate-manufactured weapons. Austen Decl. ¶ 16. Believing that inmates could be seriously injured if the fight continued, Defendant yelled, "Get down!" Austen Decl. ¶ 14, Exs. 1, 2; Pl.'s Depo. at 120:23-121:9, 143:4-144:11. All of the inmates on the yard complied with Defendant's order, except for the group of inmates participating in the riot. *Id.* Several correctional officers who were on the yard deployed multiple chemical agent grenades[5] in the direction of the combative inmates, but the inmates continued to fight. Austen Decl. ¶¶ 15, 21, Exs. 1, 2; Pl.'s Depo. at 148:20-149:3.

As the riot continued, the inmate-participants broke up into smaller groups and began to spread out. Austen Decl. ¶¶ 15, 17, Exs. 1, 2; Pl.'s Depo. at 117:3-20, 127:20-129:22, 140:5-141:20, 144:7-145:18, 152:1-155:6. A group of three inmates moved closer to Defendant's

---

[4] Defendant's exhibits 1 and 2 are true and correct copies of videos of the riot on June 7, 2018. Austen Decl. ¶ 14, Exs. 1, 2. These exhibits are in physical form only and were filed manually. *See* Dkt. 20-3. Exhibit 1's video was taken from a video camera positioned by the entrance to Building 5's concrete yard. *See* Austen Decl. ¶ 22. Exhibit 2's video was taken from a video camera positioned by the entrance to Building 7's concrete yard. *See* Austen Decl. ¶ 23. There is no dispute that the videos depict the incident complained of in the complaint and that one of the inmates in both videos is Plaintiff. *See* Austen Decl. ¶¶ 22, 23.

[5] When chemical agent grenades are deployed, the grenades have "a metal 'spoon' that will fly off the device when it is thrown." Austen Decl. ¶ 21.

4

1  position, and in that group two inmates were attacking a third inmate. Austen Decl. ¶ 17. Because
2  the two aggressor inmates had not complied with Defendant's verbal order to "get down," or
3  stopped fighting after numerous chemical agent grenades were deployed, Defendant did not
4  believe further verbal orders or the use of chemical agent grenades would stop them from fighting.
5  Austen Decl. ¶ 17. At that time, Defendant believed that it was necessary to use the 40 mm.
6  launcher to protect the third inmate from the immediate risk of serious injury. *Id.* ¶ 18. Defendant
7  aimed the 40 mm. launcher at the thigh of one of the two aggressor inmates, and fired. *Id.* The
8  round appeared to hit the intended inmate in the lower-right thigh. *Id.*

Meanwhile, Plaintiff was fighting directly with one other inmate some distance away.[6]
Pl.'s Depo. at 117:3-20, 127:20-129:22, 140:5-141:20, 144:7-145:18, 152:1-155:6; *see also*
Austen Decl. ¶ 25, Exs. 1, 2. The two inmates exchanged a few punches, and while they were a
few feet apart, facing each other, Plaintiff felt an impact to his upper lip area. *Id.* At the time
Plaintiff was hit, he did not know what the impact was from. Pl.'s Depo. at 129:23-130:14; *see
also* Pl.'s Depo. at 127:2-7. The impact caused Plaintiff to go down to his knee briefly, but then
he immediately got back up and continued trying to fight the other inmate. Pl.'s Depo. at 117:3-
20, 127:20-129:22, 140:5-141:20, 144:7-145:18, 152:1-155:6; *see also* Austen Decl. Exs. 1, 2.
Plaintiff eventually stopped fighting and got down on the ground after the chemical agents that
had been deployed made it difficult for him to breathe. Pl.'s Depo. at 130:2-21, 145:2-24. The
other inmates stopped fighting around the same time. *Id.* In total, the riot lasted approximately 45
seconds to 1 minute. Pl.'s Depo. at 120:23-121:5; 145:22-24; *see also* Austen Decl. Exs. 1, 2.

---

[6] In his opposition, Plaintiff clarifies that he was the third inmate being attacked by the two combative inmates, and that he was not fighting with another inmate in a different area. Dkt. 25 at 8-9, 11-14. Plaintiff cites to an incident report completed by one of the PBSP correctional officers, which confirms he was indeed the third inmate being attacked, to support this allegation. *Id.* at 8, 12 (citing *id.* at 24). The Court again notes that Plaintiff's opposition is unverified as it was not signed under penalty of perjury. The Court also points out that Defendant objects to Plaintiff's reliance on "unsworn statements of non-party correctional officials." Dkt. 26 at 2-3, fn. 1. However, even if Plaintiff's opposition was verified and he relied on sworn statements, such an allegation would not change the Court's analysis, as further explained below. *See infra* DISCUSSION Part IV.A. Thus, Plaintiff's location on the prison yard at the time of the incident is inconsequential. In any event, Plaintiff also presents contradictory evidence in his deposition, during which he conceded to fighting one other inmate some distance away. *See* Pl.'s Depo. at 117:3-20, 127:20-129:22, 140:5-141:20, 144:7-145:18, 152:1-155:6.

1    Sometime after the riot was over, while Plaintiff was lying on the ground, he noticed he was missing a tooth. Pl.'s Depo. at 155:13-156:9. Plaintiff was seen by a dentist later that day, and ultimately received a prosthetic tooth. Pl.'s Depo. at 158:19-20, 164:2-165:15. Plaintiff did not know that the 40 mm. launcher was used during the riot until he received a Rules Violation Report in connection with the riot sometime later. Pl.'s Depo. at 165:16-166:10. That report indicated that Defendant fired one 40 mm. round, and that the round appeared to have hit one of the combative inmates, so Plaintiff assumes he was the inmate who was struck. *Id.*

### III.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party

6

has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). Submitted by Defendant in support of the motion for summary judgment are Plaintiff's deposition (Shryock Decl., Ex. 4) as well as declarations by Defendant, Deputy Attorney General Cassandra J. Shryock (Defendant's attorney), and Scott Defoe (an expert witness specializing in police policies and procedures), along with various supporting exhibits, including two video recordings of the incident (Dkts. 20-2 through 20-7; Austen Decl., Ex. 1, 2 (video evidence)). Meanwhile, Plaintiff has filed his verified complaint. Dkt. 1. The Court will construe this filing as an affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995). However, Plaintiff has not verified his opposition and exhibits submitted in support thereof because he failed to sign them under penalty of perjury.[7] *See* Dkt. 25.

---

[7] The Court notes that even if it considered Plaintiff's allegations in his opposition to the extent such allegations are based on his personal knowledge and set forth specific facts admissible in evidence, *see Schroeder*, 55 F.3d at 460 & nn.10-11, the result would not change. Plaintiff's opposition fails to address key arguments made by Defendant, including that: (1) force that is used in a good-faith effort to maintain or restore discipline does not violate the Eighth Amendment; and (2) Defendant is entitled to qualified immunity "when courts have found no constitutional violation in similar circumstances, both before and after the incident in question[.]" *See* Dkt. 20 at 6. Further, even if Plaintiff's unverified opposition seems to ignore his deposition testimony and alleges that Defendant "used force on Plaintiff when there was no need to do so," dkt. 25 at 17, the Court explains below that Plaintiff fails to show evidence that Defendant: (a) acted

## IV. DISCUSSION

### A. Excessive Force

As mentioned above, Plaintiff claims that Defendant used excessive force in violation of the Eighth Amendment. Defendant argues that Plaintiff fails to state an excessive force claim against him because the undisputed evidence establishes that he used force in a good-faith attempt to restore order. Dkt. 20 at 10-13.

The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993). In its prohibition of "cruel and unusual punishment," the Eighth Amendment places restraints on prison officials, who may not use excessive force against prisoners. *See Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Whenever prison officials stand accused of using excessive force in violation of the Eighth Amendment, the deliberate indifference standard is "inappropriate." *Hudson*, 503 U.S. at 6. Instead, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7; *Whitley v. Albers*, 475 U.S. 312, 320 (1986). In determining whether the use of force was for the purpose of maintaining or restoring discipline or, rather, for the malicious and sadistic purpose of causing harm, a court may evaluate: (1) the need for the application of force, (2) the relationship between that need and the amount of force used, (3) the extent of any injury inflicted, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7. However, courts must accord prison administrators wide-ranging deference in the adoption and execution of policies and practices to further institutional order and security. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979);

---

maliciously or sadistically to cause harm; or (b) was not entitled to qualified immunity by showing it would have been clear to a reasonable officer that Defendant acted unreasonably against clearly established law. *See infra* DISCUSSION IV.A&IV.B. Thus, Plaintiff's opposition is inconsequential.

8

1  *Jeffers v. Gomez*, 267 F.3d 895, 917 (9th Cir. 2001).

2  Plaintiff asserts Defendant used excessive force by firing a 40 mm. launcher. Dkt. 1 at 3.
3  If the factfinder determines that Defendant's firing of a 40 mm. launcher constitutes excessive
4  force in this circumstance, it also reasonably could find that Defendant acted with the requisite
5  malicious intent. *See Hudson*, 503 U.S. at 6-7. However, applying the several *Hudson* factors to
6  the evidence before the Court leads to the conclusion that the force used by Defendant did not
7  violate Plaintiff's Eighth Amendment rights.

8  First, there was a need for the use of some force. On the date of the incident, Defendant
9  was faced with a seven-inmate riot, which included Plaintiff. Austen Decl. ¶ 13; Pl.'s Depo. at
10 111:11-114:24, 136:137:16, 149:20-150:9; *see also* Austen Decl. Exs. 1, 2. Knowing that there
11 was on-going gang violence at the time, and that inmates can be seriously injured or killed during
12 a fight or riot—regardless of whether a weapon is present, Defendant immediately ordered the
13 inmates to "get down." Austen Decl. ¶¶ 4, 5, 11, 14; Pl.'s Depo. at 73:3-17, 74:13-75:8, 98:13-
14 99:19, 120:23-121:9, 143:4-144:11; *see also* Austen Decl. Exs. 1, 2. Most inmates on the yard
15 complied, but the seven inmates continued to fight. Austen Decl. ¶ 14, Exs. 1, 2; Pl.'s Depo. at
16 120:23-121:9, 143:4-144:11. Defendant then observed other correctional staff deploy numerous
17 chemical agent grenades, but Plaintiff and the other six inmates continued to fight. Austen Decl.
18 ¶¶ 15, 21, Exs. 1, 2; Pl.'s Depo. at 148:20-149:3. At that point, a group of three inmates moved
19 closer to Defendant's position, and within the acceptable range to use the 40 mm. launcher.
20 Austen Decl. ¶¶ 10, 15, 17, 18, Exs., 1, 2; Pl.'s Depo. at 117:3-20, 127:20-129:22, 140:5-141:20,
21 144:7-145:18, 152:1-155:6. Two of the inmates were attacking a third inmate. Austen Decl. ¶ 17;
22 *see also* Austen Decl. Exs. 1, 2. Only then—when the inmates had refused verbal commands,
23 numerous chemical agents had not stopped the riot, and the third inmate was at immediate risk of
24 serious bodily injury—did Defendant fire one 40 mm. round at one of the inmates attacking the
25 third inmate. Austen Decl. ¶¶ 17-18, Exs. 1, 2. Defendant claims that he chose the lesser of the
26 two force options available to him, and he aimed at the area of the inmate-target's body that is
27 least likely to cause serious bodily injury. Austen Decl. ¶¶ 9, 10, 18. When Defendant fired the
28 40 mm. round, Plaintiff admittedly was engaged in the riot, fighting with another inmate. Pl.'s

Depo. at 117:3-20, 127:20-129:22, 140:5-141:20, 144:7-145:18, 152:1-155:6; *see also* Austen Decl. ¶ 25, Exs. 1, 2.  As mentioned, Plaintiff refused to comply with verbal commands to get down, and continued to fight after chemical agent grenades were deployed.  Austen Decl. ¶¶ 14, 15, 21, Exs. 1, 2; Pl.'s Depo. at 117:3-20, 120:23-121:9, 127:20-129:22, 140:5-141:20, 143:4-145:18, 148:20-149:3, 152:1-155:6.  In fact, Plaintiff continued to fight even after he felt an impact to his face.  Pl.'s Depo. at 117:3-20, 127:20-129:22, 140:5-141:20, 144:7-145:18, 152:1-155:6; *see also* Austen Decl. Exs. 1, 2.

Second, the relationship between the need of the use of force and the amount of force used, also favors a finding that the force used was not inflicted maliciously and sadistically for the very purpose of causing harm.  The record shows that it is undisputed that a fight was in progress involving Plaintiff and other inmates, and the officers' efforts to quell the fight by resorting to the use of a chemical agent grenade were initially unsuccessful.  It is further undisputed that Defendant and other officers on scene ordered the inmates to stop fighting and get down, but while some inmates complied, Plaintiff and six other inmates refused.  It is also undisputed that the inmates were in the process of fighting moments before the 40 mm. launcher fired, and, in fact, Defendant claims he aimed for another inmate but Plaintiff said he was also hit.  The fighting still did not stop after Defendant fired his 40 mm. launcher.  It was only until the chemical agents made it difficult for Plaintiff to breathe that he finally stopped and got down on the ground.  Pl.'s Depo. at 130:2-21, 145:2-24.

Third, the parties disagree about the extent and cause of Plaintiff's injury.  While Plaintiff claims that the injury to his face (including bruising and a lost tooth) was caused by the 40 mm. round fired by Defendant, *see* Pl.'s Depo. at 127:6-19; Dkt. 1 at 3, Defendant asserts that Plaintiff has no evidence that he was hit by the 40 mm. round and therefore Defendant did not cause any injury to Plaintiff, *see* Austen Decl. ¶¶ 18, 25; Pl.'s Depo. at 165:16-166:10.  Given that both parties have presented admissible evidence in favor of their contentions, there is a genuine dispute of material fact as to whether Plaintiff was hit and injured by the 40 mm. round.[8]  Taking the

---

[8] The Court notes that the video is inconclusive and does not show whether Plaintiff was actually hit by the 40 mm. round.  Austen Decl., Ex. 1, 2.

evidence in the light most favorable to the Plaintiff, the Court assumes that Plaintiff was hit by the 40 mm. round.[9]  Thus, the only genuine dispute would be as to the extent of the injury to Plaintiff. Still, whether the 40 mm. round caused injury does not necessarily indicate that the force was excessive.  In *Hudson,* the Supreme Court focused on whether the slight nature of the injury inflicted could defeat an Eighth Amendment claim, rather than whether an extreme injury always meant the force was excessive.  *See Hudson*, 503 U.S. at 7.  This one factor is not dispositive and does not overcome the fact that all the other factors weigh heavily in favor of a finding that the force used was necessary and reasonable under the circumstances.

Fourth, the evidence is undisputed that a threat was reasonably perceived by Defendant: a fight was in progress, and the rioting inmates (including Plaintiff) refused to follow officers' orders to stop fighting.

And fifth, Defendant attempted to temper the severity of his response by giving verbal commands before he used the 40 mm. launcher.  The evidence shows that neither the verbal commands nor the other officers' use of chemical agent grenades stopped the fight.  Plaintiff has not provided any evidence that the force used was more than necessary to stop the fight under the circumstances.  *See Hudson*, 503 U.S. at 7. Even viewing the evidence in the light most favorable to Plaintiff, any reasonable jury would determine that the 40 mm. round was fired in a good-faith effort to restore order and no reasonable jury could find that Defendant applied such force maliciously and sadistically to cause harm.  *Id.*; *see also Clement v. Gomez*, 298 F.3d 898, 903-904 (9th Cir. 2002) (affirming district court properly granted summary judgment on excessive force claim because inmates failed to establish that the officials applied pepper spray maliciously and sadistically for the very purpose of causing harm).  That Defendant's action of firing the 40 mm. round did not immediately stop the fight does not compel a different conclusion.  The question is not whether the force used achieves the goal of restoring or maintaining order, but whether the force was applied in a good-faith effort to maintain or restore discipline, or

---

[9] Even, assuming arguendo, that Defendant's 40 mm. round missed his intended target, or the round ricocheted and hit Plaintiff, the Court finds below that Defendant's actions were calculated to restore order—not to cause any inmate pain maliciously or sadistically.  *See supra* DISCUSSION Part IV.A.

11

1    maliciously and sadistically to cause harm. *See Hudson*, 503 U.S. at 6-7. Based on the evidence
2    on the record, no reasonable jury could find that Defendant fired the 40 mm. round (that ended up
3    striking Plaintiff) maliciously and sadistically to cause Plaintiff harm. *Accord Jeffers*, 267 F.3d at
4    912 (correctional officers who shot inmate being attacked during prison riot "were neither
5    malicious nor sadistic" because there was no evidence they acted purposefully to injure inmate).
6    Therefore, Defendant is entitled to judgment as a matter of law, and the motion is GRANTED.[10]

### B.    Qualified Immunity

Alternatively, Defendant argues that he is entitled to qualified immunity as to Plaintiff's claim of excessive force. Dkt. 20 at 13-15.

The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis is separate from the Eighth Amendment excessive force analysis. *See Marquez v. Gutierrez*, 322 F.3d 689, 691 (9th Cir. 2003). Thus, a guard can do an act which would violate an inmate's Eighth Amendment right but still be entitled to qualified immunity if a reasonable officer in his position would have believed that his response was a good faith effort to restore discipline. *See id.* at 692-93.

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether the right was clearly established, such that it would be clear to a reasonable official that his or her conduct was unlawful in the situation that was confronted. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case, not as a broad general proposition. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceeds in a particular sequence).

---

[10] Because the Court has determined that Defendant is entitled to judgment as a matter of law as to Plaintiff's excessive force claim, it need not address the alternative argument that Plaintiff has no evidence that the 40 mm. round that Defendant fired actually hit Plaintiff. *See* Dkt. 20 at 11-12.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullinex v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) (internal quotations omitted) (emphasis added); *see also Hamby v. Hammond*, 821 F.3d 1085, 1090-91 (9th Cir. 2016). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (*citing Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Qualified immunity permits reasonable mistakes as to what the law requires. *Saucier*, 533 U.S. at 205. Moreover, a plaintiff bears the burden of establishing that defendants violated a clearly established right. *Davis v. Scherer*, 468 U.S. 183, 187 (1984); *Browning v. Vernon*, 44 F.3d 818, 822 (9th Cir. 1995).

In sum, to determine whether an individual official is entitled to qualified immunity, the Court must determine whether (1) the official violated a constitutional right, and whether (2) the constitutional right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the particular situation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may consider these two questions in either order, and a favorable determination for the defendant on either establishes qualified immunity. *Id.* at 236.

Defendant is entitled to qualified immunity because the undisputed evidence does not give rise to an inference that he maliciously and sadistically used force on Plaintiff. *See supra* DISCUSSION Part IV.A.

Even if Defendant's actions rose to the level of a constitutional violation, he is also entitled to qualified immunity because a reasonable officer in his position would have believed that Defendant's response was a good faith effort to restore discipline. *See Marquez*, 322 F.3d at 693. Defendant shot at an inmate who was attacking another, in an attempt to stop the riot, to protect the inmate who was being attacked, and to restore order. Thus, it would not have been clear to a reasonable officer that the immediate actions taken by Defendant were unlawful. At the time of this incident in 2018, it was clearly established that a prison guard is permitted to use deadly force in a good-faith effort to maintain or restore discipline. *Jeffers*, 267 F.3d at 912 (finding prison officials were entitled to qualified immunity where inmate-plaintiff was shot while being attacked by an inmate with a knife-like weapon, because the fact that the bullet struck the plaintiff rather

13

than his attacker amounted to "negligence or recklessness, at most"); *Marquez,* 322 F.3d at 693 (holding officer was entitled to qualified immunity because "a reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful"). Given this standard, it would not have been clear to a reasonable officer that firing a less lethal 40 mm. round at an inmate's lower extremities, while that inmate is attacking another inmate, would violate the Constitution. Indeed, a reasonable official could perceive, as Defendant did, that the inmates were engaged in a fight, the third inmate was in imminent danger of suffering serious injury, and firing the less lethal 40 mm. round was consistent with, or even required by, prison officials' constitutional obligations to protect inmates from attacks by other inmates. *See Jeffers*, 267 F.3d at 917-18 (recognizing the difficult balance in prison officials' duty to protect employees, visitors, and the inmates themselves). Because the law and circumstances on June 7, 2018 did not put Defendant on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Saucier*, 533 U.S. at 202.

Accordingly, Defendant's motion for summary judgment is GRANTED on the ground that he is entitled to qualified immunity as well.

## V.   CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion for summary judgment. Dkt. 20.

The Clerk shall terminate all pending motions and close the file.

This Order terminates Docket No. 20.

IT IS SO ORDERED.

Dated: September 16, 2021

_____
JUDGE YVONNE GONZALEZ ROGERS
United States District Judge